UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| CALVIN JACKSON and CALVIN CARTLIDGE, | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| *vs.* | ) | No. 1:13-cv-1481-JMS-TAB |
| | ) | |
| MORSE MOVING & STORAGE, INC., | ) | |
| | ) | |
| *Defendant*. | ) | |

**ORDER**

Presently pending before the Court in this action brought under Title VII of the Civil Rights Act of 1964, *codified as amended at* 42 U.S.C. §§ 2000e, *et seq.* ("Title VII"), and the Civil Rights Act of 1866, 42 U.S.C. § 1981, is a Motion for Partial Summary Judgment filed by Defendant Morse Moving & Storage, Inc. ("Morse"). [Filing No. 30.]

**I.**
**STANDARD OF REVIEW**

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). As the current version of Rule 56 makes clear, whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(B). Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated. Fed. R. Civ. P. 56(c)(4). Failure

- 1 -

to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision. A disputed fact is material if it might affect the outcome of the suit under the governing law. Hampton v. Ford Motor Co., 561 F.3d 709, 713 (7th Cir. 2009). In other words, while there may be facts that are in dispute, summary judgment is appropriate if those facts are not outcome determinative. Harper v. Vigilant Ins. Co., 433 F.3d 521, 525 (7th Cir. 2005). Fact disputes that are irrelevant to the legal question will not be considered. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L.Ed. 202 (1986).

On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. Johnson v. Cambridge Indus., 325 F.3d 892, 901 (7th Cir. 2003). The moving party is entitled to summary judgment if no reasonable factfinder could return a verdict for the non-moving party. Nelson v. Miller, 570 F.3d 868, 875 (7th Cir. 2009). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. Darst v. Interstate Brands Corp., 512 F.3d 903, 907 (7th Cir. 2008). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. O'Leary v. Accretive Health, Inc., 657 F.3d 625, 630 (7th Cir. 2011). The Court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and the Seventh Circuit Court of Appeals has "repeatedly assured the district courts that they are not required to scour every inch of the record for evidence that is potentially relevant to

the summary judgment motion before them," *Johnson*, 325 F.3d at 898. Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Ponsetti v. GE Pension Plan*, 614 F.3d 684, 691 (7th Cir. 2010).

## II.
### BACKGROUND

The Court notes at the outset that Plaintiffs have not complied with Local Rule 56-1(b), which provides that a response to a motion for summary judgment "must include a section labeled 'Statement of Material Facts in Dispute' that identifies the potentially determinative facts and factual disputes that the party contends demonstrate a dispute of fact precluding summary judgment." Instead, Plaintiffs include a section titled "Statement of Material Facts," [Filing No. 39 at 2], which provides their version of events but without tying the version to alleged inaccuracies in Morse's Statement of Material Facts Not in Dispute. This approach does not comply with Local Rule 56-1(b), and has made review of the pending motion unnecessarily cumbersome.

The Court has attempted to sift through Plaintiffs' version of events, determine which facts set forth by Morse they dispute, and construe disputed facts in their favor in connection with Morse's motion when they have provided citations to evidence in the record. But failure to comply with Local Rule 56-1(b) can result in a concession of the movant's version of events. *See, e.g.*, *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 922 (7th Cir. 1994) (the Seventh Circuit has "repeatedly upheld the strict enforcement of these rules, sustaining the entry of summary judgment when the non-movant has failed to submit a factual statement in the form called for by the pertinent rule and thereby conceded the movant's version of the facts").

Giving Plaintiffs, as the non-movants, the benefit of all reasonable inferences from the evidence adduced in connection with the present motion, the Court finds the following to be the undisputed facts, supported by admissible evidence in the record:

### A. Employee Pay at Morse

#### 1. Mr. Cartlidge

Morse is a moving business primarily involved in moving and storing household goods and personal belongings.  [Filing No. 32-4 at 3.]  Mr. Cartlidge, who is African American, applied for a position at Morse in 2011, and on his application for employment, he indicated he would accept at minimum $11 per hour.  [Filing No. 39-2 at 3.]  After one interview with Pat McGinley, General Manager at Morse, Mr. Cartlidge was offered a position as a driver and warehouse worker.  [Filing No. 39-2 at 3-4.]  Mr. Cartlidge believed he would be paid between $14 and $15, as the Morse website had advertised.  [Filing No. 32-1 at 4.]  Mr. Cartlidge had no moving experience prior to working at Morse.  [Filing No. 32-1 at 3.]  When he began working at Morse as a Class C driver in July 2011, he was paid $11 per hour.  [Filing No. 39-1 at 2; Filing No. 39-2 at 4.]

When Mr. Cartlidge learned others were paid more than him at Morse, he asked Mr. McGinley for a raise.  [Filing No. 32-1 at 5.]  Mr. McGinley informed Mr. Cartlidge that he had little experience with moving, and should come back once he had learned how to do the office paperwork.  [Filing No. 32-1 at 5.]  After Mr. Cartlidge learned how to do the paperwork from another employee, Darlena Morris, Mr. Cartlidge again requested a raise from Mr. McGinley and Jeff Haddix, Operations Manager at Morse.  [Filing No. 32-1 at 5-6.]  However, Mr. Cartlidge was informed by Mr. McGinley that he would not be getting a raise at that time.  [Filing No. 32-1 at 5.]  In the spring of 2012, Mr. Cartlidge again requested a raise from Mr. McGinley.  [Filing No. 32-1 at 6.]  However, his request went unanswered and Mr. Cartlidge never received a raise.  [Filing No. 32-1 at 6.]  While at Morse, Mr. Cartlidge felt he was treated unequally because he was not paid the amount advertised, but did not know if it was because of his race.  [Filing No. 32-1 at 6.]

### 2. Mr. Jackson

Mr. Jackson, who is African American, applied for a position with Morse in 2012, and indicated on his application for employment that he would accept at minimum $12 per hour. [Filing No. 32-2 at 17.] After one interview with Mr. McGinley and Mr. Haddix, Mr. Jackson was offered a position as a driver. [Filing No. 32-2 at 5.] Mr. Jackson did not have moving experience prior to working at Morse. [Filing No. 32-4 at 6.] He began working for Morse as a Class A driver in October 2012 at a rate of $13 per hour. [Filing No. 32-2 at 5.] Subsequently, he learned that Morse's website advertised that Class A drivers received $15 per hour, but never raised the issue of pay because he did not want to cause problems and felt that if Morse had wanted to pay him that rate, then it would have. [Filing No. 32-2 at 6.]

### 3. Other Employees

Between 2010 and 2012, Morse employed sixty-eight different employees in Indianapolis. [Filing No. 32-7 at 9-10.] Twenty-six of those employees were drivers. [Filing No. 32-7 at 9-10.] Employees were paid on a scale that factored in experience and the type of license they held. [Filing No. 39-4 at 5.] Mr. McGinley had the discretion to pay wages between $13 per hour and $15 per hour for Class A drivers, before he had to seek approval from upper management. [Filing No. 39-4 at 7-8.] Mr. McGinley and Mr. Haddix were both responsible for scheduling employees. [Filing No. 32-3 at 3.] They also had the discretion to determine what jobs employees were assigned to complete. [Filing No. 39-5 at 11.] For example, they determined what employees received higher paying jobs rather than the small jobs that did not pay as well. [Filing No. 39-5 at 11.]

The pay range for Class C drivers ranged from $9 per hour to $13 per hour. [Filing No. 32-7 at 9-10.] Morse employed fourteen different Class C drivers. [Filing No. 32-7 at 9-10.] Mr.

Cartlidge was the only Class C driver listed as African American in Morse's records. [Filing No. 32-7 at 9-10.] Eight of the Class C drivers listed as white made more than Mr. Cartlidge. [Filing No. 32-7 at 9-10.]

For Class A drivers, the pay range was $13 per hour to $14 per hour. [Filing No. 32-7 at 9-10.] Morse employed five Class A drivers. [Filing No. 32-7 at 9-10.] Two of the Class A drivers were white, and they both were paid more than Mr. Jackson. [Filing No. 32-7 at 9-10.]

**B. Racial Animus at Morse**

Mr. Cartlidge and Mr. Jackson both claim they experienced racial discrimination from two co-workers, and from Morse supervisors. [Filing No. 39-2 at 14-15; Filing No. 39-3 at 16-18.] Mr. Cartlidge claims that the co-workers racially harassed him by calling him a "big black n****r," "a slow n****r," and a "dumb n****r" on multiple occasions, and said that he talked "n****rish" and no one could understand him. [Filing No. 39-2 at 15; Filing No. 39-2 at 19.] Mr. Cartlidge tried to ignore the racial slurs and keep working, but felt he was being mentally abused. [Filing No. 39-2 at 16.] Other employees encouraged Mr. Cartlidge to tell Mr. McGinley and Mr. Haddix about the racial slurs, but Mr. Cartlidge feared losing his job. [Filing No. 39-2 at 17.] Mr. Cartlidge eventually informed Mr. McGinley about the racial slurs, and talked to him between a total of ten to twelve times in 2011 and 2012. [Filing No. 39-2 at 18-19.] Mr. McGinley claims that he only heard about the incidents with the co-workers from Mr. Haddix, and did not talk to the co-workers about it because he believed Mr. Cartlidge did not want to escalate the problem. [Filing No. 39-4 at 16-17.]

Mr. Jackson also experienced racial slurs from the co-workers. [Filing No. 32-2 at 9.] While working in the warehouse, Mr. Jackson was called a "black motherf****r," a "f***ing porch monkey," and a "black motherf***ing n****r" by the co-workers. [Filing No. 32-2 at 9.]

After this incident, Mr. Jackson immediately informed Mr. Haddix. [Filing No. 32-2 at 9.] Mr. McGinley was in Mr. Haddix's office when Mr. Jackson came to report the incident. [Filing No. 32-2 at 9.] In response, Mr. Haddix told Mr. Jackson that he would talk to at least one of the co-workers. [Filing No. 32-2 at 9.] Mr. Haddix does not remember any meetings with Mr. Jackson or Mr. Cartlidge with regard to racial harassment or racial slurs. [Filing No. 32-3 at 2.]

Ms. Morris observed racial slurs directed at Mr. Cartlidge and Mr. Jackson while she worked at Morse. [Filing No. 39-5 at 6-7.] Ms. Morris also observed one of the co-workers refer to Mr. Cartlidge and Mr. Jackson as "them black guys" or "n****rs" in the presence of Mr. Haddix. [Filing No. 39-5 at 7.] Ms. Morris specifically heard Mr. Haddix tell one of the co-workers that he would not schedule "none of those n****rs with you or [the other co-worker]." [Filing No. 39-5 at 10.] Ms. Morris was nearby when Mr. Cartlidge spoke with Mr. McGinley about the racial slurs. [Filing No. 39-5 at 12.] After that conversation, Ms. Morris indicated that the co-workers' behavior did not change. [Filing No. 39-5 at 14-15.]

Timothy O'Keefe, another Morse employee, also observed the racial mistreatment that Mr. Cartlidge experienced. [Filing No. 39-6 at 3.] Mr. O'Keefe repeatedly encouraged Mr. Cartlidge to tell someone about the racial slurs. [Filing No. 39-6 at 4-5.] Mr. O'Keefe personally went to Mr. Haddix and Mr. McGinley to report his concerns about the racial treatment of employees. [Filing No. 39-6 at 6.] He told Mr. Haddix about the co-workers subjecting employees to racial slurs. [Filing No. 39-6 at 7.] Mr. O'Keefe was told the co-workers would be written up, however there was no indication they ever were. [Filing No. 39-6 at 8] Shortly after Mr. O'Keefe complained about the co-workers' behavior, Morse cut his hours. [Filing No. 39-6 at 11-14.]

### C. November 6, 2012 Trip

On November 6, 2012, Mr. Haddix assigned Mr. Cartlidge and Mr. Jackson to make a delivery. [Filing No. 32-2 at 8-10.] When Mr. Cartlidge and Mr. Jackson arrived at Morse, the truck they were assigned to drive was already loaded with the customer's goods. [Filing No. 39-3 at 31.] Mr. Jackson indicated that a preloaded truck was unusual because drivers are responsible for its contents and are held accountable for missing items. [Filing No. 39-3 at 34-35.] During the pre-trip inspection, Mr. Jackson noted that the truck was not running correctly, it needed tail-lights replaced, and its mirrors were cracked. [Filing No. 32-2 at 10.] Mr. Haddix instructed Mr. Jackson to drive the truck anyway. [Filing No. 32-2 at 10.] Mr. Jackson thought the truck was unsafe, but did not want to be insubordinate, so he drove it anyway. [Filing No. 39-3 at 30-31.]

After the pre-trip inspection, Mr. Cartlidge and Mr. Jackson went to a gas station to add fuel to the truck. [Filing No. 32-2 at 10.] At the station, Mr. Jackson continued to observe problems with the truck. [Filing No. 32-2 at 10.] After getting fuel, the truck would not start. [Filing No. 32-2 at 11.] Mr. Jackson again called Mr. Haddix to report the truck's problems. [Filing No. 32-2 at 11.] Mr. Haddix instructed him to call back when the truck started and, when he did so, Mr. Haddix told him to drive it. [Filing No. 32-2 at 11.]

Unbeknownst to Mr. Cartlidge and Mr. Jackson, the paperwork they received listed the customer's old address. [Filing No. 32-2 at 11.] They also received a map which routed them to the old address. [Filing No. 32-2 at 11.] When they arrived at the address, Mr. Jackson called the customer who informed them they were at his old address. [Filing No. 32-2 at 11.] Mr. Cartlidge and Mr. Jackson had to turn around and go to the customer's current address in Jeffersonville, Indiana, which was about 60 miles back toward where their trip had originated. [Filing No. 32-4 at 9.] When they arrived at the correct address, the customer was not home. [Filing No. 32-2 at

12.] While waiting for the customer, Mr. Cartlidge and Mr. Jackson went to a gas station to get fuel. [Filing No. 32-2 at 12.] At the station, they hit an awning and part of a sign and had to file a police report. [Filing No. 32-2 at 12.]

Mr. Cartlidge and Mr. Jackson then went to another gas station because the truck was still showing that it was out of fuel. [Filing No. 32-2 at 12.] When Mr. Jackson checked the gas tank, though, it was full. [Filing No. 32-2 at 12.] The truck would not start and Mr. Jackson called Mr. Haddix, but Mr. Haddix would not call a tow truck. [Filing No. 32-2 at 12.] The truck started up after about thirty minutes, and Mr. Jackson proceeded back to the customer's house to unload. [Filing No. 32-2 at 12.]

Mr. Cartlidge and Mr. Jackson set out to return to Indianapolis after unloading the truck, however the truck broke down on Interstate 65 near Seymour, Indiana. [Filing No. 39-3 at 41.] Mr. Jackson tried to call Mr. McGinley, but he did not answer. [Filing No. 39-3 at 42.] Mr. Jackson then tried to call Mr. Haddix who initially did not answer, but eventually called back. [Filing No. 39-3 at 42.] In the meantime, Mr. Jackson called 911. [Filing No. 39-3 at 42.] Mr. Haddix returned Mr. Jackson's call while a police officer was assisting them. [Filing No. 39-3 at 42.] The officer had offered to drive Mr. Cartlidge and Mr. Jackson to a nearby truck stop, however Mr. Haddix overheard this through the phone and instructed the men not to leave the broken down truck. [Filing No. 39-3 at 42-43.] The officer also offered to call a tow truck, but Mr. Haddix informed Mr. Jackson that Morse would not pay for a tow truck. [Filing No. 39-3 at 42-43.] Mr. Cartlidge and Mr. Jackson stayed with the broken down truck from 7:15 p.m. until 12:30 a.m. the next day, when they were finally able to get a tow truck. [Filing No. 39-3 at 43.]

Mr. Cartlidge and Mr. Jackson arrived at Morse in Indianapolis around 1:30 a.m. on November 7. [Filing No. 39-3 at 43.] They both checked the posted schedule, and neither of them

were scheduled to work that day, November 7.  [Filing No. 39-3 at 43.]  Mr. Jackson went home, then returned to Morse later during the morning of November 7 and gave Mr. Haddix the bill of lading for the trip the previous day.  [Filing No. 39-3 at 44-45.]  While there, Mr. Jackson asked Mr. Haddix why he was not scheduled to work and Mr. Haddix informed him that he was not needed.  [Filing No. 39-3 at 45.]

### D.  End of Employment at Morse

#### 1.  *Mr. Cartlidge*

Mr. Cartlidge testified that he called Morse's job line[1] every day from November 7 to November 23, 2012 but he was not listed as scheduled to work any of those days.  [Filing No. 39-1 at 3; Filing No. 39-2 at 21-22.]  On November 23, Mr. Cartlidge went to Morse to get his paycheck. [Filing No. 39-2 at 22-23.]  While there, Mr. Haddix asked Mr. Cartlidge for his gas card so that another driver could use it.  [Filing No. 39-2 at 23.]  Mr. Cartlidge knew he was fired at this point because each employee was issued a gas card.  [Filing No. 39-2 at 23.]  Mr. Cartlidge asked Mr. Haddix if there was work for him, and Mr. Haddix said there was not and that business was slow. [Filing No. 39-2 at 23.]  Mr. Cartlidge then had his wife call Morse and ask for him, and she was told that Mr. Cartlidge no longer worked there.  [Filing No. 39-2 at 24.]

#### 2.  *Mr. Jackson*

While Mr. Jackson was at Morse on November 7, he asked Mr. Haddix if he could work on November 8, but Mr. Haddix told him he was not needed.  [Filing No. 32-2 at 15.]  On November 9, Mr. Jackson called Morse and talked with Mr. Haddix and Mr. McGinley who informed him

---

[1] Morse's job line was a one-way recording the employees called to find out if they were scheduled to work the following day.  [Filing No. 39-4 at 23-24.]  The job line contained a prerecorded message that listed an employee's name and the time they should report to work.  [Filing No. 39-5 at 17.]  Mr. Haddix and Mr. McGinley were responsible for recording the employee schedule on the job line.  [Filing No. 39-5 at 17-18.]

that he was not needed.  [Filing No. 32-2 at 15.]  Mr. Jackson did not check the schedule again because he believed he was not going to be scheduled anymore.  [Filing No. 32-2 at 15-16.]  On November 16, Mr. Jackson spoke with Mr. Haddix who asked him to return his gas card.  [Filing No. 32-2 at 16.]  Mr. Haddix asked Mr. Jackson when he was going to be near Morse again, and Mr. Jackson said he only comes there when he is scheduled to work.  [Filing No. 32-2 at 16.]  Mr. Haddix then told Mr. Jackson he needed to come to Morse to get his last paycheck.  [Filing No. 32-2 at 16.]  On November 23, Mr. Jackson went to Morse to return his gas card and get his last paycheck.  [Filing No. 32-2 at 16.]

According to Mr. McGinley, Mr. Cartlidge and Mr. Jackson were terminated based on a no-call/no-show policy – *i.e.*, for failing to show up to work and for not notifying Morse that they would be absent.  [Filing No. 32-4 at 13.]  The Morse dispatcher recorded no-call/no-shows for Mr. Cartlidge and Mr. Jackson on November 7, 16, 17, 19, and 20.  [Filing No. 32-4 at 14-24.]  However, Ms. Morris was told by Mr. Haddix that he was not going to schedule them to work at all after the November 6 trip.  [Filing No. 39-5 at 17.]  Additionally, Franklin Keen, another Morse employee, was also told by Mr. Haddix that he was going to stop scheduling Mr. Cartlidge after the November 6 trip.  [Filing No. 39-7 at 5-6.]

### E.  Lawsuit

Mr. Cartlidge and Mr. Jackson initiated this action on September 17, 2013.  [Filing No. 1.]  They assert claims for: (1) deprivation of their "rights to make and enforce contracts in violation of 42 U.S.C. § 1981 including, but not limited to, making, performing, modifying and terminating their contracts of employment at Morse, and enjoying all of the benefits, privileges, terms and conditions of their contractual relationships"; (2) unlawful race discrimination and retaliation "with respect to their compensation, terms, conditions or privileges of employment"; (3) unlawful

"limit[ation], segregat[ion] or classifi[cation]….in a way that deprived or tended to deprive them of employment opportunities and otherwise adversely affected their status as employees because of their race" in violation of Title VII; and (4) failure and refusal to protect them from racial harassment and a racially hostile work environment. [Filing No. 1 at 7.][2]

### III.
#### DISCUSSION

Morse moves for partial summary judgment on Plaintiffs' claims for discriminatory pay and retaliation. The Court addresses each claim in turn.

**A. Discriminatory Pay Based on Race**

Morse argues that Plaintiffs were not subjected to discriminatory pay based on their race. [Filing No. 31 at 13.] It argues that Plaintiffs cannot show that they were paid lower than similarly situated non-protected class members because they were paid what they asked for or more, they were paid comparable to other drivers, and they were paid relative to their moving experience. [Filing No. 31 at 14-16.]

In response, Plaintiffs argue that Morse paid them less than other employees because of their race. [Filing No. 39 at 14.] They assert that Mr. Cartlidge was paid $11 per hour, was the only listed African American Class C driver, and was the only Class C driver paid less than $12 per hour. [Filing No. 39 at 16.] They also assert that three Class C drivers were paid $13 per hour, and one of those drivers only worked at Morse for a period of less than two months. [Filing No. 39 at 15-16.] They contend that Mr. Jackson was paid $13 per hour and all other Class A drivers

---

[2] On July 1, 2014, the Court ordered the party with the burden of proof (Plaintiffs) to file a "statement of claims or defenses it intends to prove at trial, stating specifically the legal theories upon which the claims or defenses are based" within fourteen days after the non-expert discovery deadline. [Filing No. 19.] Although the deadline for non-expert discovery passed on October 12, 2014, [*see* Filing No. 27], Plaintiffs had not filed a statement of claims or defenses as of the date of this Order.

who were not African American were paid between $13.50 and $15 per hour. [Filing No. 39 at 16.] Additionally, Plaintiffs argue that they were no less skilled than white drivers holding the same class of driver's license. [Filing No. 39 at 16.] Plaintiffs also argue that Mr. McGinley allowed them to be taunted and abused by their coworkers and then attempted to cover up knowledge of racial harassment by retroactively making file notes. [Filing No. 39 at 17.] Plaintiffs conclude that Morse's stated reasons for paying them less are a "subterfuge to conceal race discrimination." [Filing No. 39 at 18.]

On reply, Morse argues that Plaintiffs were not discriminatorily paid, but were paid based on what they requested in their initial interview. [Filing No. 40 at 1.] Specifically, Morse argues that Mr. Cartlidge was paid his requested amount of $11.00 per hour and other white, Class C drivers were paid less at between $9 per hour and $10.50 per hour. [Filing No. 40 at 3.] Additionally, Morse argues that Mr. Cartlidge's hours could not have been cut because he was not a full-time employee. [Filing No. 40 at 4.] Morse contends that Mr. Jackson was paid $13 per hour, which was more than his requested amount of $12 per hour. [Filing No. 40 at 4.] Additionally, Morse argues that there was an African American Class A driver who was paid $14 per hour. [Filing No. 40 at 4.]

To overcome summary judgment on a Title VII discrimination claim, Plaintiffs may either proceed under the direct method, *Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004), or proceed under the indirect method by utilizing the burden-shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). As to their method of proof, Plaintiffs compare their pay to that of other Morse employees, and discuss whether those employees are "similarly situated" to them. [Filing No. 39 at 15-16.] This indicates that Plaintiffs are proceeding under the indirect method of proof.

In order to survive summary judgment under the indirect method, Plaintiffs must first establish a prima facie case of discrimination. *McDonnell Douglas Corp.*, 411 U.S. at 802. Specifically, they must show that: (1) they are members of a protected class; (2) they performed at a level that met Morse's legitimate expectations; (3) they suffered an adverse employment action; and (4) they were treated differently than a similarly situated person outside of their protected class. *See Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 790 (7th Cir. 2007) (citation omitted). If Plaintiffs can make that showing, the burden shifts to Morse to come forth with a "legitimate, non-discriminatory reason" for its actions. *Hill v. Potter*, 625 F.3d 998, 1001 (7th Cir. 2010) (citation omitted). If Morse can do so, it will prevail unless Plaintiffs can come forward with evidence that the proffered nondiscriminatory reason is "a pretext for intentional discrimination." *Serednyj v. Beverly Healthcare, LLC*, 656 F.3d 540, 551 (7th Cir. 2011) (citation omitted).

To determine whether an employee is similarly-situated, "a court must look at all relevant factors, the number of which depends on the context of the case." *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617 (7th Cir. 2000). Some factors include showing that the employees "dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Id.* at 617-618. "Similarly situated employees 'must be directly comparable to the plaintiff in all material respects,' but they need not be identical in every conceivable way." *Coleman v. Donahoe*, 667 F.3d 835, 846 (7th Cir. 2012). But the similarly-situated inquiry and the pretext inquiry "are not hermetically sealed off from one another." *Id.* at 857-58. Often, "the prima facie case and the pretext analyses overlap," and "the similarly-situated inquiry dovetails with the pretext question." *Id.* at 858. Under those circumstances, "comparator evidence can do 'double-duty' at both the prima facie and pretext stages." *Id.*

## 1. *Initial Pay*

The only element of a prima facie case Morse argues is missing in connection with Plaintiffs' claim that they were initially paid less than their white counterparts is that similarly situated employees outside of Plaintiffs' protected class were treated differently. [*See* Filing No. 31 at 14-15; Filing No. 40 at 2-5.] In arguing that they were paid less than similarly-situated, white employees, Plaintiffs direct the Court to a spreadsheet prepared by Morse which indicates that eight white Class C drivers were being paid more than Mr. Cartlidge, who was the only listed African American Class C driver. The spreadsheet also indicates that the only two white Class A drivers were being paid more than Mr. Jackson. Morse does not dispute that the other employees holding the same types of driver's licenses as Plaintiffs are similarly situated to Plaintiffs, but argues only that not all white drivers were paid more than Mr. Cartlidge, and that an African American Class A driver was paid more than some white Class A drivers. But Plaintiffs need not show that *every* similarly situated employee was paid more than they were, and the Court finds that the fact that eight white Class C drivers were paid more than Mr. Cartlidge and that the only two white Class A drivers were paid more than Mr. Jackson is enough for Plaintiffs to demonstrate that similarly situated white employees were treated differently than they were. According, Plaintiffs have demonstrated a prima facie case of discriminatory pay based on race.

The burden then shifts to Morse to come forth with a "legitimate, non-discriminatory reason" for its actions. *Hill*, 625 F.3d at 1001. Morse argues that Plaintiffs' pay had nothing to do with race, and that it paid Plaintiffs the amounts they requested on their job applications. [Filing No. 31 at 16.] It is undisputed that Morse paid Plaintiffs the amounts they requested on their applications – or more, in the case of Mr. Jackson. The Court finds that this was a legitimate, non-

discriminatory reason for paying them the amounts they were paid. Accordingly, the burden then shifts back to Plaintiffs to present evidence that the stated reason was a pretext for discrimination.

Plaintiffs argue that "a jury should be permitted to conclude that [Plaintiffs] were paid lower hourly rates because of their race, and that the reasons given for paying them less money were not the real reasons for the pay disparity, but merely a subterfuge to conceal race discrimination." [Filing No. 39 at 18.] But they do not submit any evidence that this was the case – indeed, they do not address the fact that Morse paid them what they requested on their job applications at all. Summary judgment "is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Johnson, 325 F.3d at 901*. To be sure, there is disturbing evidence of racial animus in this case, but Plaintiffs have not tied that evidence to their claim that Morse discriminated against them in connection with their initial pay rate.

### 2. *Lack of Raises*

Plaintiffs also argue that Morse discriminated against them by not giving them raises during their employment. [Filing No. 39 at 17.] As to Mr. Cartlidge, while there is evidence that he asked for a raise multiple times, he has not presented any evidence that other employees received raises during that time either, so cannot show that non-protected, similarly situated employees were treated differently. Because Mr. Cartlidge has not demonstrated a prima facie case, his discrimination claim based on Morse's refusal to give him a raise fails.

Mr. Jackson had only been working at Morse for approximately a month when he took the November 6, 2012 trip with Mr. Cartlidge that immediately preceded their termination. He has not presented any evidence that he asked for a raise during his brief employment. [*See* Filing No. 32-2 at 6 (Mr. Jackson testified that he never raised the issue of pay while employed at Morse

because, among other things, he did not want to cause problems).] This lack of evidence is fatal to any claim he is making for discrimination based on lack of a raise during his employment.

The Court finds that Plaintiffs have put forth a prima facie case of disparate pay based on racial discrimination in connection with their initial pay, but not for discrimination in connection with Morse's refusal to give them a raise. The Court also finds, however, that Plaintiffs have not shown that Morse's reason for initially paying Plaintiffs certain amounts – that Plaintiffs requested those amounts on their applications – was pretext for discrimination. Accordingly, Morse is entitled to summary judgment on Plaintiffs' claim for discriminatory pay based on race.

### B. Retaliatory Termination Based on Complaints of Racial Harassment

Morse argues that there is no evidence that Plaintiffs' complaints about racial animus were the cause of their termination. [Filing No. 31 at 17.] Rather, Morse argues the evidence tends to show they were terminated for the November 6, 2012 trip. [Filing No. 31 at 17.] Additionally, Morse argues that Plaintiffs were terminated based on the no-call/no-show policy. [Filing No. 31 at 19.] Morse also argues that the timing of Plaintiffs' complaints about racist comments indicates they were not terminated because of their complaints since Mr. Cartlidge's complaints began eleven months before termination and he complained up to nine times, and Mr. Jackson complained two times shortly before his termination. [Filing No. 31 at 18.] Morse also argues that there is no evidence Mr. Haddix or Mr. McGinley responded negatively to Plaintiffs' complaints. [Filing No. 31 at 18.] Finally, Morse argues that Plaintiffs cannot prove their prima facie case under the indirect method of retaliation because they were not meeting Morse's legitimate job expectations in connection with the November 6, 2012 trip since they caused property damage at the gas station and failed to complete their job. [Filing No. 31 at 19.]

In response, Plaintiffs argue that they repeatedly called Morse's job line to see if they were scheduled to work and they were never listed. [Filing No. 39 at 18.] They also point to testimony from Ms. Morris and Mr. Keen that Mr. Haddix told them he would not schedule Plaintiffs again after November 6. [Filing No. 39 at 18.] Plaintiffs argue that evidence of racial animus at Morse is overwhelming and that racial harassment was condoned and covered up by Mr. McGinley and Mr. Haddix. [Filing No 39 at 19.] Additionally, Plaintiffs argue that Morse cannot create new reasons why they no longer work at Morse – for example, that they were fired because of the November 6 trip or for poor performance – when Morse initially stated that they were fired based on the no-call/no-show policy. [Filing No. 39 at 19.] Plaintiffs argue that although complaints of racial harassment had been ongoing for eleven months, Mr. McGinley or Mr. Haddix may have tired of hearing the complaints and were looking for an excuse to fire them. [Filing No. 39 at 20.]

On reply, Morse argues that they gave an alternative reason for Plaintiffs' terminations because Morse's non-discriminatory reason that they were terminated because of the no-call/no-show policy was disputed by Plaintiffs. [Filing No. 40 at 6.] Morse argues that the fact that Plaintiffs were not scheduled after November 6 does not support their claim that they were terminated based on complaints of racial harassment. [Filing No. 40 at 6.] Morse also argues that Mr. McGinley's and Mr. Haddix's failure to address complaints of racial harassment does not show that Plaintiffs were terminated in retaliation for their complaints. [Filing No. 40 at 6.] Morse argues that under either theory of termination – the no-call/no-show policy or the November 6 incident –Plaintiffs' claims fail because Morse can identify a nondiscriminatory reason for termination. [Filing No. 40 at 8.] Morse argues that although there is evidence that Plaintiffs were racially harassed, the eleven month time span from the beginning of the complaints to termination

makes it less likely that they were terminated in retaliation for the complaints. [Filing No. 40 at 9.]

On surreply,[3] Plaintiffs argue that they were never informed they would be working part-time, nor were they informed that they would be classified, paid, or assigned work any differently from other Morse drives. [Filing No. 46 at 1.] Although they did not have specific days or hours of work, Plaintiffs argue they were entitled to the same days and hours as other drivers doing similar work. [Filing No. 46 at 1.] Plaintiffs argue that while they did not work the same schedule as other drivers, that fact does not preclude a finding that they were wrongfully and intentionally prevented from working the same hours as co-workers. [Filing No. 46 at 2.] They argue that Mr. McGinley was in charge of scheduling and controlled the days and hours each employee worked and also reserved higher paying jobs for select employees. [Filing No. 46 at 2.] Additionally, they argue that when others complained of racial harassment at Morse, they were laid off or had their hours reduced. [Filing No. 46 at 2.] Mr. Cartlidge also claims that he was given fewer hours than comparable drivers and that as his complaints of racial harassment increased, his pay checks de-creased[4] and white drivers with less seniority were given more hours and higher paying moving assignments. [Filing No. 46 at 2-3.]

Plaintiffs appear to bring their retaliation claim under both Title VII and Section 1981. [*See* Filing No. 1 at 7.] Discrimination claims under Title VII and § 1981 are "nearly identical, and [the parties] treat[ ] them identically," therefore, the Court will "apply the same analysis" to

---

[3] The Court granted Plaintiffs' Motion for Permission to File a Limited Surreply Brief in response to Morse's contention that Mr. Cartlidge cannot claim his hours were cut in retaliation for complaints because neither he nor Mr. Jackson were hired as full-time employees, but rather as non-regularly scheduled employees. [*See* Filing No. 41 at 1.]

[4] At one point in 2011, Mr. Cartlidge received bi-weekly checks totaling $1,000.00 or more. [Filing No. 46 at 2.] In 2012, Mr. Cartlidge received paychecks as low as $100.00 or $200.00 per week. [Filing No. 46 at 2-3.]

Plaintiffs' claims. *Dass v. Chicago Bd. of Educ.*, 675 F.3d 1060, 1068 (7th Cir. 2012); *see McGowan v. Deere & Co.*, 581 F.3d 575, 579 (7th Cir. 2009) ("[A]lthough section 1981 and Title VII differ in the types of discrimination they proscribe, the methods of proof and elements of the case are essentially identical") (citation and quotation marks omitted).

Plaintiffs may use either the direct or indirect method of proof to establish a prima facie case of retaliation under Title VII and Section 1981. *Andrews v. CBOCS West, Inc.*, 743 F.3d 230, 234 (7th Cir. 2014). Under the direct method, Plaintiffs would need to demonstrate that: (1) they engaged in statutorily protected conduct; (2) they suffered an adverse employment action; and (3) there is a causal connection between the two. *See Phelan v. Cook County*, 463 F.3d 773, 787 (7th Cir. 2006). Alternatively, Plaintiffs may proceed under the indirect method by showing that: (1) they engaged in a statutorily protected activity; (2) they met Morse's legitimate expectations; (3) they suffered an adverse employment action; and (4) they were treated less favorably than similarly-situated employees who did not engage in a statutorily protected activity. *Moser v. Ind. Dep't of Corrs.*, 406 F.3d 895, 903-04 (7th Cir. 2005). If Plaintiffs establish their prima facie case, the burden shifts to Morse to provide a legitimate non-discriminatory reason for its employment action. *Id.* at 904. If Morse provides such a reason, the burden shifts back to Plaintiffs to demonstrate that the employer's proffered reason is pretextual. *Id.*

In the instant case, Morse argues that Plaintiffs' retaliation claim fails under either method of proof because Plaintiffs cannot prove causation or that they met Morse's legitimate job expectations. [Filing No. 31 at 17-19.] Under the direct method, Morse concedes that Plaintiffs have satisfied the first two elements, [*see* Filing No. 31 at 17], but argues that they cannot prove the third element – that their complaints of racial harassment led to their termination. Morse specifically notes that Mr. Cartlidge and Mr. Jackson were terminated based on the no-call/no-policy.

However, Mr. Cartlidge and Mr. Jackson claim that they called the job line every day after the November 6, 2012 trip and were never scheduled. These assertions directly contradict one another.

Specifically, Morse claims that Plaintiffs were scheduled for November 7, 16, 17, 19, and 20 and did not call or report to work. Morse recorded November 7 as a no-call/no-show day for Mr. Cartlidge and Mr. Jackson, yet both testified that they arrived to Morse after the November 6 trip in the early hours of November 7, checked the posted schedule for that day, and determined that neither of them were listed. [Filing No. 39-3 at 43.] This directly conflicts with Morse recording a no-call/no-show for Plaintiffs on November 7.

Additional evidence supports Plaintiffs' claim that Morse retaliated against them for complaining about racial animus. Ms. Morris testified that Mr. Haddix said he would not schedule Plaintiffs to work with the co-workers. Mr. O'Keefe testified that when he complained regarding the co-workers' treatment of Plaintiffs, his hours were cut. Further, the evidence at this stage of the case shows that Morse management did nothing to address Plaintiffs' concerns about racial animus.

Reading the facts in the light most favorable to Plaintiffs as the non-movants, the Court finds that Plaintiffs have sustained their burden of showing that there is a causal connection between their complaints about racial harassment and their terminations.[5] Because Plaintiffs have sustained their burden under the direct method of proof for their retaliation claim, the Court need

---

[5] Morse argues that the timing of the complaints and termination favors its position because there were eleven months between the start of Mr. Cartlidge's complaints and his termination, and he complained up to nine times, before he was terminated, and Mr. Jackson complained twice before he was terminated. [Filing No. 31 at 18.] While a long period of time between complaints and adverse action may tend to disprove causation in the retaliation context, *see Leonard v. E. Ill. Univ.*, 606 F.3d 428, 432 (7th Cir. 2010), the Court need not reach that issue because of the additional and significant evidence supporting causation here. In any event, the inferences are to be drawn in favor of Plaintiffs at this stage of the litigation, and the jury is in the best position to decide the inferences to be drawn from the timing of the complaints.

not consider whether Plaintiffs have demonstrated a prima facie case under the indirect method or whether Morse's stated reasons for terminating them were pretext for discrimination. Morse is not entitled to judgment as a matter of law on Plaintiffs' retaliation claim, and that claim will proceed to trial.

## IV.
### CONCLUSION

For the foregoing reasons, the Court **GRANTS** Morse's Motion for Partial Summary Judgment to the extent that it finds that Morse is entitled to summary judgment on Plaintiffs' discriminatory pay claim, but **DENIES** Morse's Motion for Partial Summary Judgment to the extent that it finds that Morse is not entitled to summary judgment on Plaintiffs' retaliation claim. [Filing No. 30]. No partial judgment shall issue, and Plaintiffs' retaliation claim and other remaining claims will proceed to trial.

Additionally, the Court **ORDERS** Plaintiffs to file a statement of claims within **14 days** of this Order, as discussed in the Court's July 1, 2014 Order, [Filing No. 19].


April 17, 2015

_Jane Magnus-Stinson_
Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana




**Distribution via ECF only to all counsel of record**